AMERICAN REFRIGERATOR TRANSIT COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 64782, 67602, 72861. Promulgated October 31, 1934.

*James M. Chaney, Esq.,* for the petitioner.
*James L. Backstrom, Esq.,* for the respondent.

OPINION.

ARUNDELL: For 16 years prior to the tax years in controversy the petitioner computed its annual depreciation charges to operating expenses on the basis of 5 percent of the diminishing value of its cars, that is, 5 percent of 100 percent of cost in the first year, 5 percent of 95 percent of cost in the second year, 5 percent of 90 percent of cost in the third year, and so on, until the aggregate depreciation deduc-

tions with respect to any particular car amounted to 60 percent of cost or book value, when depreciation deductions with respect to that car were discontinued. By this method, 60 percent of the cost or book value of petitioner's cars was written off in 18 years. The remaining 40 percent of cost or book value was carried on the books undiminished as representing the salvage value at the end of useful life. It must be assumed that these annual depreciation charges were reasonable allowances for exhaustion, wear and tear, including obsolescence, of petitioner's cars, in the light of conditions then existing, for, notwithstanding that they were computed by a method which, from an income tax standpoint, is highly unsatisfactory, *Albia Box & Paper Co.*, 4 B. T. A. 1184, they were allowed by respondent as deductions in computing taxable net income. Thus, the importance of the method by which petitioner computed the depreciation deductions claimed in earlier returns becomes obscure, as it inevitably must, for after all the question is not one of methods, but rather the reasonableness of the deductions claimed. *American South African Line, Inc.*, 30 B. T. A. 753.

In the tax years in controversy petitioner claimed depreciation deductions which were computed by the same method as was used in computing the deductions of the prior 16 years, except that depreciation on new cars was computed on the straight line basis, that is, at 5 percent of cost. The respondent rejected these deductions and, having determined that 30 years is the average useful life of petitioner's cars, allowed deductions equivalent to 3⅓ percent of the average book values as of the beginning and close of each year.

Unless there be present unusual circumstances which justify a departure from the rule, a proportional part, based upon estimated useful life, of cost less salvage value will reflect a reasonable allowance for depreciation of wasting assets. This is what the parties are contending for here. They disagree, however, as to what are the useful life of petitioner's cars and the base or cost less salvage value.

We have found as a fact that the average useful life of petitioner's cars is 20 years. To support that finding, we have the uncontroverted testimony of three expert witnesses, who, by training and years of practical experience, are peculiarly fitted to express opinions on the subject. They knew the state of condition of petitioner's cars, as to wear and tear, obsolescence, availability and usefulness, for, in their respective positions of auditor, superintendent of transportation, and mechanical superintendent in petitioner's employ, they were required to keep themselves informed on the subject. They testified that obsolescence, brought on by advances made and being made in the art of refrigerating cars for the transportation

of perishable shipments and improvements in the construction of refrigerator cars, has substantially lessened the usefulness of petitioner's cars to a period much shorter than their physical life, and that it is the largest single factor to be reckoned with in estimating useful life; and to that factor they have assigned the greatest weight in their estimates of useful life. There is extrinsic evidence to support their judgment in that respect. In 1919 the United States Railroad Administration introduced a new United States standard refrigerator car that, in every important feature of construction, method of refrigeration, and efficiency in protecting perishable shipments, was a radical departure from the cars then in use. The introduction of that new standard type of car sounded the death knell of the older types of cars, or so circumscribed their sphere of usefulness that their employment as transportation facilities has been reduced to only occasional use and is a matter of much difficulty. In 1922, when petitioner first commenced the replacement of its older type of cars with the newer type, the older cars constituted 100 percent of its entire car equipment, while six years later, in 1928, they represented but 46 percent of all the cars owned. Thus, within the short period of six years, more than one half of petitioner's older cars were supplanted with the newer type; and though the older cars represented 46 percent of all the cars owned, their mileage earnings represented less than 8 percent of petitioner's total mileage revenues. Furthermore, the petitioner is now confronted with a further advance in the art of refrigerating cars, that of producing refrigeration with mechanical devices, and the testimony is that the ice bunkers of petitioner's cars must give way, before the end of physical life, to the new mechanical means of refrigeration.

Further confirming the opinions of these witnesses are the facts pertaining to the age of cars owned in the taxable years. Less than 15 percent of the cars, on the average, were more than 20 years old. Of course, this situation largely reflects the replacements of older cars with newer cars since 1922; but, confronted now with a further revolutionary change in methods of refrigeration, it is not at all likely that any great error would result in basing the estimate of useful life upon the petitioner's actual experience. True, a large number of this 15 percent are substantially older than 20 years; but the fact that they are still being carried in petitioner's capital accounts is best explained by the auditor's testimony as to the reluctance of the board of directors to charge them off in years of low earnings, which is confirmed by the mechanical superintendent's statement that his repeated requests or recommendations to retire these older cars have been ignored by the board of directors.

The determination that 20 years is the useful life of petitioner's cars necessarily precludes from consideration, in determining the annual depreciation deductions, all cars in excess of that age, and the base should be reduced accordingly. The evidence shows that the average cost of the older cars is $1,200. The elimination of all cars over 20 years old will, therefore, reduce the cost basis, as of the close of 1928, 1929, 1930, and 1931, by the amounts of $1,903,200, $1,888,800, $1,863,600, and $2,714,400, respectively.

A further factor to be considered in fixing the depreciation base is the estimated salvage value of cars at the end of useful life. Consistently since 1912, the petitioner has carried 40 percent of cost on the books as representing estimated salvage value. However, the facts set forth in the findings indisputably show that while 40 percent of cost was a fair estimate of salvage value in 1912, when petitioner first adopted a depreciation policy, it is much too high under the circumstances existing in the taxable years in controversy. Interchangeability of parts and high scrap prices gave high values to salvaged materials in the years immediately following 1912. In the taxable years in controversy that interchangeability of parts had been largely lost, while scrap prices had materially declined from the high levels of earlier years. Comparing the salvage actually realized within the cost of cars retired in the taxable years, we conclude that 12 percent of cost is the maximum salvage value that may be ascribed to petitioner's cars. The cost basis of cars under 20 years old, as of the close of 1928, 1929, 1930, and 1931, should be reduced, therefore, by the amounts of $2,521,290.55, $2,862,491.02, $3,249,299.73, and $3,138,935.04, respectively, representing salvage values.

After giving effect to the above adjustments for elimination of cars over 20 years old and salvage values, the bases, as of the close of 1928, 1929, 1930, and 1931, are $18,489,464.03, $20,991,699.78, $23,828,198.06, and $23,018,857.00; and the average bases are $19,740,532.40 for 1929, $22,409,899.42 for 1930, and $23,423,527.52 for 1931. Applying a rate of 5 percent, based on a useful life of 20 years, to these average bases, we conclude that reasonable allowances for depreciation of petitioner's cars are $987,026.62 for 1929, $1,120,494.97 for 1930, and $1,171,176.38 for 1931.

*Decision will be entered under Rule 50.*